GUIDRY, Judge.
In this tort action, plaintiffs sought general and special damages in connection with injuries allegedly sustained by Tina, David and B’Trice Goodeaux when the vehicle in which they were riding was struck from the rear by a car being operated by a DeRidder, Louisiana, policeman, William R. Sanders, who was, at the time of the accident, in the course and scope of his employment with the City. Following a trial on the merits, wherein defendants admitted liability, the trial judge awarded damages as follows:
General damages for Tina Goodeaux: $67,500.00
Loss of earnings for Tina Goodeaux: 7,572.15
General damages for David Goo-deaux: 500.00
General damages for B’Trice Goo-deaux: 750.00
Past Medical Expenses (the total amount stipulated to by counsel for all parties): 12,393.00
Future Medical Expenses: 507.10
TOTAL DAMAGES: $89,222.25
Defendants were cast for all costs.
Plaintiffs appeal urging the following specifications of error:
1. The trial court erred in that its awards for general damages to Tina, David and B’Trice Goodeaux were grossly inadequate and contrary to the law and evidence.
2. The trial court erred in denying Tina Goodeaux any damages for future loss of wages.
3. The trial court erred in that its award for future medical expenses to Tina Goo-deaux was grossly inadequate and contrary to the law and evidence.
The trial judge set forth, in excellent reasons for judgment, the facts of this case and his conclusions on the issue of damages. We are pleased to adopt his reasons *31 as our own in disposing of the issues presented in this appeal.
“This suit arises out of an automobile accident that occurred on North Pine Street in the City of DeRidder on Friday, July 6, 1984. An automobile operated by plaintiff Tina Goodeaux, and in which her two minor children, David and B’Trice, were passengers, was rear-ended by a police vehicle owned by defendant City of DeRidder and operated by defendant William R. Sanders, who was a city policeman in the course and scope of his employment. Mrs. Goodeaux and the two children were injured in the accident and this suit was filed to recover the damages sustained by them.
"At the trial the defendant admitted liability for the accident and injuries and, accordingly, the evidence was limited to the issue of damages.
“Immediately after the accident Mrs. Goodeaux and the children were taken to the emergency room at Beauregard Memorial Hospital in DeRidder, where they were seen by Dr. Taylor. According to Mrs. Goodeaux, her neck was x-rayed and she was hospitalized for a broken neck. The next day she transferred to Lake Charles Memorial Hospital to see Dr. Drez, an orthopedic surgeon. The following day, Sunday, July 8, Mrs. Goodeaux was discharged from that hospital to return to her home. She said Dr. Drez told her she had a cervical strain, not a broken neck, and she should continue to see Dr. Taylor.
“Mr. [sic] Goodeaux said she remained under Dr. Taylor’s care until December, 1984, when he released her. Prior to her discharge by Dr. Taylor, she went back to Lake Charles and saw Dr. Gunderson, an associate of Dr. Drez. She said that doctor also told her she had a cervical strain and should continue to see Dr. Taylor.
“At the time of the accident Mrs. Goo-deaux was thirty years of age, married to Jimmy Goodeaux, and employed as a secretary by Joe B. Dees Construction, Inc. Because of her injuries Mrs. Goodeaux did not return to her job until August 13, 1984, when she began working half-days, which she continued through September 3, when she resumed full-time employment. Thereafter Mrs. Goodeaux remained on the job and worked on a full-time basis until she was hospitalized again in June, 1985.
"As indicated, Mrs. Goodeaux was released by Dr. Taylor in December, 1984, and she saw no other medical doctor until June 4, 1985, when she went to see Dr. Dean Moore, a neurosurgeon in Lake Charles. However, Mrs. Goodeaux said that in March, 1985 she saw Dr. Stephenson, a chiropractor in DeRidder.
“At this point it should be noted that there is no medical evidence of Mrs. Goo-deaux’s condition from the date of the accident until she saw Dr. Moore, approximately eleven months later. Although she had been examined and treated by Dr. Taylor, Dr. Drez, Dr. Gunderson, and Dr. Stephenson, and had been hospitalized at Beauregard Memorial and Lake Charles Memorial, no reports by or testimony from those doctors and no hospital records were presented at trial. Thus, for that period of time the Court has no evidence of what complaints Mrs. Goodeaux made to the doctors, what examinations were made, what conditions were found, or what treatment was rendered.
“When Mrs. Goodeaux saw Dr. Moore on June 4, 1985, her chief complaints were neck pain and numbness on the left side of her body. She also complained at that examination of some blurring of vision. In his examination Dr. Moore found some tenderness in the cervical spine, but no muscle spasm or any limitation of motion. According to Dr. Moore, Mrs. Goodeaux had essentially a normal neurologic examination with some mechanical findings in her neck and he recommended that she go into the hospital for some head tests and a myelogram.
“On June 9, 1985, Mrs. Goodeaux was admitted to Lake Charles Memorial Hospital where she underwent the tests recommended by Dr. Moore. According to the doctor, the head tests were all normal, but the myelogram showed a herniated disk [sic] at the C6-7 level. Based on that finding, on June 14, 1985, a diskectomy [sic] was done by the doctor and Mrs. Goodeaux *32 was discharged from the hospital on June 17, 1985.
“Mr. [sic] Goodeaux returned to Dr. Moore on June 19, 1985, for post-op followup [sic]. Her sutures were removed at that time and she had some neck pain, but otherwise her doctor felt she was doing well. However, she was not to return to work yet or to engage in any strenuous activity. She saw the doctor again on July 3 and August 14, 1985. On August 27, 1985, Dr. Moore testified in a deposition that he believed Mrs. Goodeaux had done really well since her surgery and was recovering in normal fashion. According to the doctor’s records at that time, Mrs. Goodeaux was not on any prescribed pain medication.
“Dr. Moore said that Mrs. Goodeaux’s complaints of numbness in the entire left side of her body and blurring of vision were not related to or caused by the disk [sic] injury and he could not explain those complaints on an anatomical basis. Although she had those complaints when she first saw him on June 4, 1985, she had stopped those complaints by August.
“On August 15, 1985, approximately two months after her surgery, Mrs. Goodeaux returned to her job with Joe B. Dees Construction, working four hours per day. At the time of the trial on September 3, 1986, she was still working at that job on that basis. She said she previously worked from 8:00 A.M. until 3:30 P.M., five days a week, but since August 15, 1985, she has been able to work only from 8:00 A.M. to 12:00 noon.
“Dr. Moore continued to follow Mrs. Goo-deaux after she returned to work. He saw her on September 11, 1985, and she told him she had returned to work on a part-time basis and was having some pain and discomfort. He asked her to return in approximately six weeks and she went back on November 5,1985. Again, he asked her to return in six weeks and she went back on December 19, 1985. At that time Mrs. Goodeaux told Dr. Moore she had been doing well until about two weeks prior to that date when she began to have pain at the base of her neck and occasionally in both arms. Her next visits were on January 30 and March 26, 1986, and each time she complained of pain in her neck and both arms. In view of those continued complaints Dr. Moore arranged for Mrs. Goodeaux to have a MRI test of the cervical spine and that was done on April 16, 1986.
“The MRI test showed a posterior bulging of the disk [sic] at C4-5. According to Dr. Moore, that test is suggestive of another herniated disk [sic] at that level, but a diagnosis cannot be made from that test alone. He recommended that Mrs. Goo-deaux have an EMG and another myelo-gram. She told him that she would go into the hospital for those tests at a later date, but she did not do so and had not done so at the time of the trial.
“Although Dr. Moore testified that the MRI examination made on April 16, 1986 was suggestive of a disk [sic] injury at C4-5, he said no such injury was present when the myelogram was made in June, 1985. That myelogram showed all the cervical interspaces and the only defect present was at C6-7, and that is the one that was surgically repaired by Dr. Moore. Under the circumstances, without the additional tests he recommended, Dr. Moore could not say that it is probable Mrs. Goo-deaux has another herniated disk [sic] or, if she does, that it was caused by the accident of July 6, 1984.
“Dr. Moore gave a second deposition on August 19, 1986, and said that he had last seen Mrs. Goodeaux on August 6, 1986. According to him, she had the same complaints of pain in her neck and both arms and she told him she wanted to go into the hospital during the following month for the recommended tests. Dr. Moore said he told her to return when she was ready to have the tests and he would make the arrangements, but she did not return for that purpose.
“Dr. Moore said that, according to his records, he had not recently prescribed any pain medication for Mrs. Goodeaux. However, she testified that she had obtained a prescription from him in July, 1986, for Darvocet, a pain medication. But she said she had used only one bottle of prescription *33 pain medication between July, 1985 and July, 1986, but she explained that she frequently took non-prescription medication such as Tylenol and Advil.
“On August 19, 1986, at the request of defendants, Mrs. Goodeaux was seen by Dr. Lynn E. Foret, an orthopeadic surgeon in Lake Charles. In addition to examining Mrs. Goodeaux, Dr. Foret reviewed her medical reports, including the myelogram made on June 12,1985, and the MRI report rendered in April, 1986. At the time of the examination Mrs. Goodeaux was complaining of constant pain in the cervical spine and chest and bilateral arm pain and numbness. The doctor’s examination was essentially normal. He said Mrs. Goodeaux’s complaints were primarily subjective and he could find no evidence of any nerve root irritation or other neurological problem. Dr. Foret saw no reason why she should not be able to work a full eight-hour day as a secretary.
“Dr. Foret agreed with Dr. Moore that the possible problem at C4-5 shown on the MRI test was not shown by the myelogram made in June, 1985. He added that if the condition shown by the MRI test was present when the myelogram was made, it was of no importance because it was too insignificant to appear in the myelogram. Based on his examination of Mrs. Goo-deaux and his interpretation of her medical records, Dr. Foret said he saw no reason why she should have to undergo another myelogram.
“The Court finds that Mrs. Goodeaux has established by a preponderance of the evidence that she sustained a herniated disk [sic] at the C6-7 level as a result of the accident that occurred on July 6, 1984. However, she has not established by a preponderance of the evidence that she has another herniated disk [sic] at the C4-5 level or that any defect at that level is causally related to the accident.
"The Court is satisfied that since she was injured in the accident Mrs. Goodeaux has sustained varying degrees of pain, discomfort, mental anguish, disability, and inconvenience. The lack of medical evidence for the period between July 6, 1984 and June 4, 1985 complicates and makes more difficult the task of evaluating the extent of her damages. Another difficulty is the lack of medical evidence to establish whether Mrs. Goodeaux has any significant permanent impairment or disability as a result of her surgery.
“General damages are not susceptible of exact proof and there is no precise rule for the measurement of such damages. Each case must be judged on it [sic] own facts and circumstances. From the evidence presented in this case, the Court finds that Mrs. Goodeaux is entitled to an award of $67,500.00 as general damages for the injuries, pain, suffering, mental anguish, disability, and inconvenience that have been or may be sustained as a result of the accident.
“Mrs. Goodeaux also has a claim for past and future loss of wages resulting from the accident. As indicated above, she missed work from July 6 to August 15, 1984 and then she began working half-days until September 4, at which point she began working full-time. Her 1984 rate of pay was $4.75 per hour and her regular hours were from 8:00 A.M. to 3:30 P.M., with an hour off for lunch. Her hourly rate was increased to $5.00 on July 1,1985. Mrs. Goodeaux worked on a full-time basis until June 4, 1985, when she was hospitalized for disk [sic] surgery. She did not work between June 14 and August 14, 1985, but thereafter she returned to her job and began working from 8:00 A.M. til 12:00 noon five days a week. She was still following that work schedule at the time of the trial.
“Mrs. Goodeaux contends that her loss of earnings between June 6,1984, and September 3,1986, amounted to $7,575.15. Although it is somewhat confusing from the testimony and the payroll records as to Mrs. Goodeaux’s earnings before and after the accident, the Court finds that she has established the claim by a preponderance of the evidence and she will be awarded that amount.
“The claim for future loss of earnings must be rejected because Mrs. Goodeaux has not established by a preponderance of *34 the competent credible evidence that she has a permanent disability or impairment which will prevent her from working full-time [sic] as a secretary. On the basis of the evidence presented any award for future loss of earnings would be supported only by mere speculation or conjecture. Mrs. Goodeaux’s claimed impairment is not apparent to the Court and there is no medical evidence which establishes that her earning capacity is permanently impaired. She has worked regularly at her job four hours a day since August 15, 1985, and as far as the Court is concerned there is no satisfactory medical explanation as to why she must limit herself to that schedule. The computation by the economist, Dr. Goodman, of estimated future loss of earnings cannot be accepted because it is predicated on the unproven assumption that Mrs. Goodeaux’s earning capacity has been permanently impaired as a result of the accident.
“Turning now to the two children who were with Mrs. Goodeaux at the time of the accident, both received very minor injuries. David, who was thirteen at that time, hit his head on the dash and he went to the emergency room at Beauregard Memorial and was x-rayed and had his reflexes checked by the doctor. There was no medical evidence presented as to any injuries sustained by the boy and he had very little to say about his condition. David will be allowed general damages in the amount of $500.00.
“B’Trice was two years old at the time of the accident and apparently she sustained no physical injuries but she was frightened by the collision and cried. Thereafter she was nervous and did not sleep well. Also, she was somewhat fearful of riding in an automobile. No medical evidence was presented on behalf of B’Trice and she was too young to testify at the trial. However, there is no doubt that she was shaken up in the accident and sustained some physical and mental pain and anguish. She will be allowed general damages in the amount of $750.00.
“The total of the medical expenses incurred by Mrs. Goodeaux, David and B’Trice was stipulated to be $12,393.00. Of that total $12,000.00 was for Mrs. Goo-deaux, $373.00 for David, and $20.00 for B’Trice. The stipulated total will be awarded as damages.
“Dr. Moore recommended a second mye-logram for Mrs. Goodeaux to try to determine a cause for her continued complaints. In view of that recommendation, Mrs. Goo-deaux is entitled to an award for the cost of the examination. Dr. Moore said his charge for a myelogram is $372.00, but he would not estimate the hospital expenses. Por the myelogram made in June, 1985, the hospital charged at least $135.10. Therefore, the Court will allow a total of $507.10 ($372.00 for Dr. Moore and $135.10 for hospital costs) for future medical expense.
“In summary, the damages to be awarded are as follows:
$67,500.00 — General damages for Mrs. Goodeaux
7,572.15 — Loss of earnings for Mrs. Goodeaux
500.00 — General damages for David Goodeaux
750.00 — General damages for B’Trice Goo-deaux
12,393.00 — Past medical expenses
507.10 — Future medical expense of Mrs. Goo-deaux
$89,222.25 — Total damages
“All costs are to be paid by defendants, including the following expert witness fees:
$275.00 — Dr. Moore
150.00 — Dr. Foret
150.00 — Dr. Goodman”
The law is well settled that absent a clear abuse of the much discretion left to the trial judge, damage awards in personal injury actions may not be disturbed on appeal, even though an appellate court may believe a different award would have been more appropriate. Wolfshohl v. Boudreaux, 482 So.2d 954 (La.App. 3rd Cir.1986); La.C.C. art. 2324.1. As we stated in Showers v. Loughlin, 497 So.2d 361 (La.App. 3rd Cir.1986):
“In the review of an award of damages, the question is not whether a different award might have been more appropriate but whether the award of the trial court can reasonably be supported by the evidence and justifiable inferences from it. Augustine v. Dickenson, 406 So.2d 306 (La.App. 3rd Cir.1981)....”
In this case, we find the awards made by the trial court reasonably supported by the evidence and justifiable inferences from it. *35 Accordingly, the judgment appealed from is affirmed. All costs of this appeal are assessed against appellants.
AFFIRMED.